### In re Quester STERLING–SUÁREZ, Petitioner.

### No. 02–1907.

United States Court of Appeals, First Circuit.

Heard Oct. 7, 2002.

Decided Oct. 9, 2002.

Juan F. Matos de Juan, Assistant Public Defender, with whom Joseph C. Laws, Jr., Public Defender, and Patricia Garrity, Esq., Research and Writing Specialist, were on brief for petitioner.

David I. Bruck, Federal Death Penalty Resource Counsel, on brief for Federal Death Penalty Resource Counsel Project, Amicus Curiae.

Nelson Pérez–Sosa, Assistant United States Attorney, with whom H.S. Garcia, United States Attorney, Sonia I. Torres–Pabón, Assistant United States Attorney, and Edwin O. Vázquez, Assistant United States Attorney, were on brief for respondent.

Before BOUDIN, Chief Judge, TORRUELLA and LIPEZ, Circuit Judges

BOUDIN, Chief Judge.

In this case, we are asked to construe language in 18 U.S.C. § 3005 (2000), providing that following the indictment of the defendant on a capital crime, the court "shall promptly, upon the defendant's request" assign two counsel "of whom at least 1 shall be learned in the law applicable to capital cases. . . ." We conclude that "promptly" means promptly after indictment, not (as the government asserts) only after the Attorney General has made a determination to seek the death penalty. The pertinent facts can be quickly stated.

Petitioner Quester Sterling–Suárez was arrested on March 27, 2002, and on the following day he was brought before a magistrate judge based on a criminal complaint. A federal public defender in Puerto Rico was appointed as counsel. On April 3, 2002, a grand jury indicted petitioner on several counts for his alleged involvement in an armored car robbery in which one of the guards was killed. 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j), 1951(a) (2000). The charges included a count for which the death penalty is a permissible penalty.[1]

On April 4, 2002, the day following the indictment, petitioner asked that he be appointed "learned counsel" in accordance with 18 U.S.C. § 3005. As amended in 1994, "learned counsel" under section 3005 has to have expertise in the law "applicable to capital cases." *See also United States v. McCullah,* 76 F.3d 1087, 1098 (10th Cir. 1996), *cert. denied,* 520 U.S. 1213, 117 S.Ct.

---

**1.** In a certificate required by local rules, the United States identified only one count—un-

der 18 U.S.C. 924(j)—as punishable by death.

1699, 137 L.Ed.2d 825 (1997). Under the District of Puerto Rico's Local Rule 428(4), lead counsel in a capital case must possess a number of specified qualifications which include prior experience, within the last three years, "as defense counsel in a capital case." The rule also provides that its provision should be implemented by the presiding judge "at the earliest practical opportunity, once a defendant is charged in a capital case." *Id.* 428(1). The Federal Public Defender's office represents that it does not have a person thus qualified in its office.

On April 9, 2002, the government filed a certificate, as required by local rules, identifying the case as one in which the maximum possible penalty is death. D.P.R. R. 428(2)(A). The decision whether to seek the death penalty is made by the Attorney General, but only after considering the recommendations of the local U.S. attorney and an advisory committee within the Department of Justice. United States Attorneys' Manual § 9–10.020 (June 7, 2001). Under Department of Justice procedures, defense counsel is entitled to make submissions to both the U.S. attorney and the Department, arguing that the Attorney General's discretion should be exercised against seeking the death penalty. *Id.* §§ 9–10.030, 9–10.050.

On April 24, 2002, during a status conference, petitioner's April 4 request for appointment of learned counsel was denied. The court explained: "Once the Court receives the decision from the Department of Justice, then learned counsel will be appointed." Following the superseding indictment, petitioner asked the district court to reconsider its denial of the motion requesting immediate appointment of learned counsel. On July 8, 2002, the district court denied the motion for reconsideration. Petitioner then sought mandamus from this court to compel the appointment of learned counsel.

■ Ordinarily, mandamus is treated as an extraordinary remedy granted only where there is a clear entitlement to relief and threat of irreparable harm. *In re Cargill, Inc.,* 66 F.3d 1256, 1260 (1st Cir. 1995), *cert. denied,* 517 U.S. 1156, 116 S.Ct. 1545, 134 L.Ed.2d 648 (1996). The government points out that if petitioner were convicted and sentenced to death, he would be able to raise his statutory claim on direct appeal and it argues that the statutory claim made by petitioner is at least debatable. Of course, the reality is that once a determination by the Attorney General is made to seek the death penalty, the incentive for defendant to plead guilty in exchange for a term of imprisonment is obvious.

■ The question whether there is a threat of irreparable injury and clear error need not be decided. This is so because this court has authority to grant "advisory mandamus" in situations that involve undecided questions of "great public importance" that are likely to recur. *See United States v. Horn,* 29 F.3d 754, 769–70 (1st Cir.1994). The occasions for employing advisory mandamus are and should remain extremely rare; the procedure should be reserved only to address questions "likely of significant repetition prior to effective review" where guidance from the court will assist other judges, parties or lawyers. *In re Bushkin Assocs., Inc.,* 864 F.2d 241 (1st Cir.1989) (internal quotation marks and citation omitted).

■ In our view, the question when learned counsel must be appointed in a federal capital case is a recurring question that ought to be settled at the earliest opportunity. Although the question has arisen several times within this circuit, *e.g. United States v. Torres Gómez,* 62 F.Supp.2d 402, 407–08 (D.P.R.1999), it has not yet been, but clearly ought to be, definitively resolved by this court. In ad-

dition to the obvious interest of the defendant, a speedy resolution also serves the public interest in assuring compliance with the special requirements that Congress has imposed, by statute, for capital cases.

■ Turning to the merits, statutory language and policy alike support the view that—in general and without ruling out the possibility of unusual circumstances—learned counsel is to be appointed reasonably soon after the indictment and prior to the time that submissions are to be made to persuade the Attorney General not to seek the death penalty. As the statute is written, the word "promptly" is used in relation to a prior event—namely, the indictment of the defendant upon a capital crime. Nothing suggests that this appointment is to await the Attorney General's determination to seek the death penalty, although Congress could easily have so provided if it had wanted to do so.

Admittedly, the term "promptly" is not self-defining; if there were no purpose served by appointing learned counsel until the Attorney General had decided to seek the death penalty one could argue that the appointment should be made promptly *when* it mattered and not before. But surely in death penalty litigation, special learning in the law "applicable to capital cases," 18 U.S.C. § 3005, is likely to be especially useful in making and supporting arguments about mitigating and aggravating factors, primarily made at the stage when the Attorney General is determining whether or not to seek the death penalty and (still later) when the jury is determining the sentence. *See* 18 U.S.C. §§ 3591 (special conditions), 3592 (mitigating and aggravating factors) (2000). By contrast, whether the defendant committed the crime is a trial phase issue often little different than those presented in non-capital cases.

Quite possibly, as the government urges, the submissions to the Attorney General are not matters of right and the Departmental procedures that invite such submissions do not create an entitlement. But our concern here is with a *statutory* right to learned counsel; and the practical opportunity for learned counsel to persuade the Attorney General casts light on what the word "promptly" means in the statute. Similarly, we are not concerned with whether, for purposes of "the right to counsel" under the Sixth Amendment, the preliminary submissions are or are not a "critical" phase of the proceeding. *United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984); *compare United States v. Peña–González,* 62 F.Supp.2d 358, 361–64 (D.P.R.1999).

The government's contrary position on the meaning of "promptly" rests on three arguments. The first is that in the 1994 amendments to section 3005, Congress imposed the requirement of counsel "learned in the law applicable to capital cases," and, as to the timing of counsel's appointment, changed "immediately" to "promptly." *See also Torres Gómez,* 62 F.Supp.2d at 407. Nothing indicates that the substitution was meant to authorize a delay until after the Attorney General decided to seek the death penalty. It is equally possible that "promptly" was chosen in place of "immediately" because securing learned counsel—especially in a jurisdiction like Puerto Rico that does not have capital punishment for local crimes—may be a process that takes a reasonable amount of time and can hardly be done "immediately" after indictment.[2]

---

**2.** Absent legislative history, both explanations are speculation but, in support of the latter, we note that, indeed, the 1994 amendments require the court to consider counsel recommendations of the Federal Public Defender organizations or the Administrative Office of the United States Courts. 18 U.S.C. § 3005.

The government's next argument is based upon policy rather than the statute. It argues that securing and compensating learned counsel is an expensive process. A considerable number of cases are eligible for capital punishment but in many the Attorney General decides not to seek the death penalty. This, in the government's view, means that in such cases the appointment of learned counsel will be wasted. This might seem an inhumane argument, but—in a case where the statutory language were less clear—a vast expenditure to practically no purpose might well count as an argument against petitioner's interpretation.

However, the argument is faulty. In some cases the early appointment of learned counsel will not be wasted at all but may well make the difference as to whether the Attorney General seeks the death penalty (and perhaps as to whether defendant lives or dies). Further, the submission to the Attorney General is a comparatively informal one and in those cases where the opposition succeeds in persuading the Attorney General not to seek the death penalty, a substantial additional expenditure on the trial and sentencing phase of a capital case is likely to be avoided. There is certainly no indication that requiring employment at the earlier stage will necessarily be a waste of money.

Finally, the government asserts that the case law is favorable to it because at least three circuits held under the pre–1994 version of section 3005 that (we quote from the government's brief) "the two-attorney provision did not apply when the defen-

dant did not actually face the death penalty." The government says that Congress' enactment of the 1994 amendment, done against the background of these prior interpretations, should be taken to embody the then-existing view of the courts. Yet all three of the cases cited by the government were ones in which the death penalty was no longer available for the defendant because of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972);[3] none of the cases is precedent for the government's present position that a defendant who might still be executed can be denied the swift appointment of learned counsel.

So far as we can tell, the only appellate case that directly addresses the precise question before us is the decision in *United States v. Boone,* 245 F.3d 352 (4th Cir.2001). There, by a two-to-one vote, the Fourth Circuit adopted the view we take of the matter. *Compare id.* at 358 (Widener, joined by Luttig, *Circuit Judges* ) *with* 364 (Kiser, *Senior District Judge,* dissenting). In our view, Judge Kiser's main target—the case in which the government has permanently disavowed any claim to the death penalty—presents quite a different problem than the one before us. *See also United States v. Grimes,* 142 F.3d 1342, 1347 (11th Cir. 1998), *cert. denied,* 525 U.S. 1088, 119 S.Ct. 840, 142 L.Ed.2d 695 (1999).

There are other cases in which a court has declined to provide to the defense other advantages peculiar to capital cases unless the death penalty is actually sought.[4] There may well be situations in

---

3. *United States v. Dufur,* 648 F.2d 512, 514–15 (9th Cir.1980), *cert. denied,* 450 U.S. 925, 101 S.Ct. 1378, 67 L.Ed.2d 355 (1981); *United States v. Shepherd,* 576 F.2d 719, 727–29 (7th Cir.), *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1978); *United States v. Weddell,* 567 F.2d 767, 770–71 (8th Cir.1977), *cert. denied,* 436 U.S. 919, 98 S.Ct. 2267, 56 L.Ed.2d 761 (1978).

4. *See, e.g., United States v. Goseyun,* 789 F.2d 1386, 1387 (9th Cir.1986) (peremptory challenges); *United States v. Kaiser,* 545 F.2d 467, 475 (5th Cir.1977) (witness list); *United States v. Maestas,* 523 F.2d 316, 319 (10th Cir.1975); *Hall v. United States,* 410 F.2d 653, 660 (4th Cir.) (witness list), *cert. denied,* 396 U.S. 970, 90 S.Ct. 455, 24 L.Ed.2d 436 (1969).

which such a distinction makes sense (*e.g.,* information as to trial witnesses); but·in this case there *are* practical reasons to treat the case as capital from indictment forward, for purposes of appointing learned counsel, until it becomes clear that the death penalty is no longer an option. Words used in statutes, after all, are tools and a phrase like "capital case" can mean different things in different contexts.

It appeared at oral argument that the United States Attorney in Puerto Rico has already made a recommendation in· this case to the Attorney General apparently after considering a submission made by a federal public defender. There is no indication that the Attorney General has yet considered the matter, and we express no views on the consequences that our decision may have on the absence of learned counsel at the time that initial submissions were made to the United States Attorney.

*The writ of mandamus is granted.* Learned counsel shall be appointed forthwith.